In re the Marriage of Sandra Jean **NOVOTNY**, Petitioner, Respondent,

v.

James Joseph **NOVOTNY**, Appellant.

No. C9–86–298.

Court of Appeals of Minnesota.

Oct. 14, 1986.

Review Denied Nov. 26, 1986.

Michael C. Black, St. Paul, for respondent.

Ronald D. Ousky, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and SEDGWICK and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

SEDGWICK, Judge.

The marriage of Jim and Sandra Novotny was dissolved December 2, 1985. The parties were awarded joint legal custody of their two small sons with physical custody granted to the mother. This appeal is from the judgment and order denying father's motion for a new trial. We affirm.

## FACTS

Sandra and Jim Novotny were married on July 10, 1976. They have two children, Jeffrey age 9 and Jared age 6. They separated in August 1984 and Jim received temporary custody of the boys. At the time he had no house and no place for the boys, so the children continued to stay with their mother.

The parents alternated custody on a weekly basis beginning in June 1985. Following a full custody hearing, the mother was granted physical custody.

Both parents have their share of problems, however they both love and care for their children. Sandra stayed at home with the boys from October 1977 to March 1985. Jim worked as an NSP electrician on a 3 to 11 shift and "moonlighted" in his drywall business which often kept him away from home.

The Novotnys met with various experts through the counseling and custody process. All of the experts gave the opinion at trial that Jim should be the custodial parent. Dr. John Austin, a psychologist, administered the Minnesota Multiphasic Personality Test (MMPI) to both parents. On the basis of the MMPI, Sandra was judged to be hostile, close-minded, self-centered, and critical. Dr. Austin testified that her emphasis on "self" threatens emotional harm to the children. According to his MMPI, Jim was diagnosed as a depressed, emotionally dependent and passive personality. The test indicated his potential for problems with alcohol, which Sandra claimed was a major problem with the marriage. Jim told the experts that he has greatly reduced his alcohol use.

The only expert who interviewed the children, Dr. Sara Hunter, a licensed consulting psychologist, said that "the boys perceive both mother and father as fair and equally loving." She observed:

These children in my view look healthier than most children I have encountered in custody evaluations at this point, and I think that's a tribute to the way both parents may be handling the children because often at this point children are very depressed, very anxious.

The trial court found that the mother had been the primary caretaker of the children from their birth until August 31, 1985 when respondent assumed temporary custody pursuant to court order. The trial court further found that the father had failed to make "the strong showing of unfitness" required to deprive the primary parent of custody. *Pikula v. Pikula*, 374 N.W.2d 705, 711 (Minn.1985).

## ISSUES

1. Did the trial court properly interpret and apply Minn.Stat. § 518.17 and *Pikula* when it awarded custody to the respondent-mother?

2. Was the evidence sufficient to support the court's custody decision?

## ANALYSIS

Child custody decisions are required by statute to reflect "the best interests of the

child." Minn.Stat. § 518.17, subd. 1 (1984). Appellate review is restricted

> to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law.

*Schultz v. Schultz*, 383 N.W.2d 379, 381 (Minn.Ct.App.1986).

Minn.Stat. § 518.17 lists the factors to be addressed by the trial court in arriving at custody decisions.

In *Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985), the supreme court determined that for children too young to express a preference, the intimacy and trust between the child and the primary parent must take precedence in the custody decision. Maintenance of the bond between the primary parent and child is crucial to the "best interests of the child."

> The importance of emotional and psychological stability to the child's sense of security, happiness, and adaptation * * * is a postulate embedded in the statutory factors and about which there is little disagreement within the profession of child psychology. For younger children in particular, that stability is most often provided by and through the child's relationship to his or her primary caretaker—the person who provides the child with daily nurturence, care and support. As we further noted in *Berndt* [292 N.W.2d 1, (Minn.1980)], a court order separating a child from the primary parent could thus rarely be deemed in the child's best interests.

*Id.* at 711 (footnote omitted) (citations omitted).

The supreme court adopted the test utilized in *Garska v. McCoy*, 278 S.E.2d 357 (W.Va.1981). The indicia encompass the duties commonly performed by the primary parent, such as cooking, cleaning, training, grooming, discipline, taking the child to the doctor, or to meet friends, even getting up in the middle of the night for water, etc. *Pikula*, 374 N.W.2d at 713 (quoting *Garska*, 278 S.E.2d at 363).

Appellant points out that the *Pikula* analysis contains three elements. The starting point is whether the children are capable of expressing a preference. Here, Dr. Hunter found the children perceived the parents as equally fair and loving. Her testing of the children indicated Jeffrey "ever so slightly" preferred his dad with whom he was living at the time.

The second step in a *Pikula* analysis ascertains the primary caretaker. Appellant argues he was the primary parent. Evidence does not support this claim. Although psychological testing revealed a strong bond between father and sons, to a degree commonly associated with the primary parent, the record supports the trial court's finding that mother performed the day-in, day-out tasks of parenting. Since the father commonly worked two jobs, he was frequently absent from the family. Dr. John Austin observed:

> I think Jim's ability as a parent, abilities as a parent have improved dramatically since I first saw him back in December of 1984. A large portion of our time in therapy is spent discussing situations with the children, how to respond to various conflicts of time and energy and family relationships that arise when one has children, and Jim has been very eager and interested to learn more about parenting skills.

Appellant's primary concern is the third *Pikula* factor.

> [W]hen both parents seek custody of a child too young to express a preference for a particular parent and one parent has been the primary caretaker, custody [must] be awarded to the primary parent *absent a showing that that parent is unfit to be the custodian.*

*Pikula*, 374 N.W.2d at 713 (emphasis added).

In this case, the third element of the *Pikula* test encouraged the parties to bring up every character fault to deny custody. Appellant attacked Sandra as an immature, self-centered hedonist. She complained that Jim drinks too much and is foul-mouthed and slovenly.

The parties are not perfect, but they care for the boys. Under Jim's custody, the boys have done well. Jim has apparently reformed his use of alcohol. Sandra has, however, nurtured the children most of their lives; they are described as good kids, devoted to their parents, and bearing up well under the pressures of divorce. Sandra may not be a stable personality, but she apparently knows how to parent. The risk of emotional harm testified to by Dr. Austin was apparently based on her flat refusal to accept criticism of her parenting and her refusal to seek therapy. Neither he nor any of the other experts *ever* observed this mother with these children. They did observe her lack of interest in counseling, her disinterest in continuing the marriage and her MMPI. While the statute and case law require the courts to determine who *has been* the child's primary parent, the experts here, on the basis of the MMPI determined who *would be* the most acceptable primary parent in the future. The law determines the fact of primary parenthood from evidence of the past, not on test indicia of negative or positive personality traits.

The weight and interpretation of the evidence rests with the trial court. There is sufficient evidence to support Sandra's capacity as a good parent. The custody award, after considering the record, is not an abuse of the court's broad discretion. *Jorschumb v. Jorschumb*, 390 N.W.2d 806 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Aug. 22, 1986).

Although the trial court essentially adopted respondent's findings, the decision is supported by the record. The adopted findings reflect a fair consideration of the facts.

### DECISION

The trial court did not abuse its discretion in granting custody to the mother. The trial court did not abuse its discretion in finding a lack of strong support to justify a custody award to the non-primary parent. *See Pikula,* 374 N.W.2d at 711.

We affirm.